2023 IL App (2d) 230019
No. 2-23-0019
Opinion filed November 15, 2023

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| WILLIAM F. MURPHY, Executor of the Estate of William C. Murphy, Deceased, | ) ) ) | Appeal from the Circuit Court of Kane County. |
| Plaintiff-Appellant, | ) ) | |
| v. | ) ) | Nos. 18-L-143 |
| | ) ) | 17-MR-1142 |
| KINNALLY FLAHERTY KRENTZ LORAN HODGE & MASUR, P.C., f/k/a Kinnally, Krentz, Loran, Hodge & Herman, P.C., | ) ) ) ) ) | Honorable Kevin T. Busch, |
| Defendant-Appellee. | ) | Judge, Presiding. |

JUSTICE SCHOSTOK delivered the judgment of the court, with opinion.
Presiding Justice McLaren and Justice Kennedy concurred in the judgment and opinion.

**OPINION**

¶ 1       In this breach of contract action, the trial court barred the estate of William C. Murphy (Murphy), acting through the plaintiff, its representative, William F. Murphy (William), from introducing several items of evidence and then entered a directed verdict, finding that the estate had not submitted sufficient evidence to support its claim. The estate appeals. We vacate the directed verdict and remand for a new trial.

¶ 2                                    BACKGROUND

¶ 3       The decedent, William C. Murphy, was a graduate of Harvard Law School and practiced law with distinction for almost 70 years. For decades, he practiced with the defendant firm, Kinnally Flaherty Krentz Loran Hodge & Masur, P.C.

¶ 4 In 1999, Murphy and his partner Robert Hupp entered into an agreement under which they became "of counsel" to the firm (then known as Murphy Hupp & Kinnally). Under the 1999 agreement, Murphy and Hupp would continue to receive office space, administrative support services, and professional liability and health insurance, and were not required to devote any specific amount of hours to practicing law. They would be paid one-third of any time they billed, and a one-third share of any net fees received by the firm for any probate or contingent personal injury cases they brought to the firm, when those fees were collected. The 1999 agreement also required the firm to pay Hupp, who worked on transactional matters, 50% of the monthly retainer received by the firm from the Fox Valley Park District. The agreement could be terminated upon 90 days' written notice by either party or by corporate dissolution.

¶ 5 Hupp died in 2003. Under the 1999 agreement, the firm continued to pay Hupp's widow his share of the monthly retainer fees collected after his death.

¶ 6 In 2004, Murphy and the firm entered into a revised "of counsel" agreement. At trial, Gerald Hodge (one of the firm's current principals) testified that he was the primary drafter of the 2004 agreement. He agreed that the "Hupp problem" of "extensive lingering obligations" following the death of an "of counsel" lawyer was a concern that led to the drafting of the 2004 agreement. The revised agreement addressed this concern in part through section 6(c), which expanded termination events to include the death of Murphy or any of the firm's principals. The revised agreement also changed section 4, which addressed the issue of compensation:

> "4. *Compensation.*
>
> A. WCM [(Murphy)] shall receive Thirty-Three and one-third (33⅓%) Percent of the net fee to KKLHH [(the firm)] when actually collected for all probated estates or trusts which he generates, regardless of whether the estate work was performed by KKLH [*sic*] or WCM.

B. For all contingent fee personal injury cases and for worker's compensation cases, will contests, condemnation, or commercial contingent fee cases brought to KKLHH by WCM, the latter shall receive the following compensation when the fee is collected by KKLHH:

(1) One-third (⅓) of any contingent fee case resulting in a net fee to KKLHH unless a referral fee to another attorney or professional corporation is owed;

(2) If a referral fee is owed to another attorney or professional corporation, then WCM shall receive one-fourth (¼) of the net contingent fee.

Net contingent fee means the fee to KKLHH before the payment of any referral fees or a portion of the fees to WCM.

C. To the extent that WCM bills work for his own time, he shall receive Thirty-three and one-third (33⅓%) Percent of his personal time billed when it is collected.

D. WCM and KKLHH agree that any matter not covered by this agreement which results in income from the practice of law shall be referred to KKLHH exclusively unless the latter shall consent to a referral to another attorney/law firm.

E. In the event this agreement is terminated for any reason, KKLHH's payment obligations are limited to paying WCM any amounts collected for which it owes WCM fees for a period of two months following the month in which the termination becomes effective."

The first four provisions were carried over from the 1999 agreement, albeit organized slightly differently. Paragraph 4E was new, added to address the "Hupp problem."

¶ 7    In 2012, Murphy referred Terry and Amy Seyller to the firm. In October 2012, the firm filed a personal injury lawsuit on behalf of the Seyllers (Seyller case) in the circuit court of Cook County.

¶ 8    On February 29, 2016, Murphy wrote a letter to William, his son, a lawyer like himself, whom he had named as executor of his testamentary estate. The letter stated in relevant part:

"Dear Bill,

I wanted to outline for you my relationship with Kinnally Flaherty. I attach my 'of counsel' agreement with the firm which is still in effect. It has worked well with *no* problems over the years.

[I]n the event of my death, however, there are two cases in which I have an interest:

1. *Seyller v. BNSF et al.*: This is the case which Maire Ann Snider got for me and which I referred to the firm. They have proceeded with it in the Circuit Court of Cook County *** and it is set for trial in *March 2017*. No settlement offers have been made. In the event of a recovery, *I am entitled to ⅓ of the total fee* as a forwarder." (Emphasis in original).

Attached to the letter was a copy of the 2004 agreement.

¶ 9    Murphy died on November 25, 2016, while the Seyller case was still pending. William, as the executor of his father's estate, retained Hodge as attorney for the estate. On April 26, 2017, William e-mailed Hodge about various estate matters. Among other things, William asked, "Whatever happened with the *Seyller v. Burlington Northern* case ***?" Hodge e-mailed back the next day, saying "My recollection is that Seyller was continued to the fall by motion of the defendants (I will check on that and let you know, if different)."

¶ 10    On June 30, 2017, one of the principals of the firm, Mark Masur, wrote a letter to William, informing him that the Seyller case had tentatively settled.[1] Masur also wrote:

> "Upon final resolution and funding, we will distribute $150,000.00 for your Dad's interest in this case. We did not have a written agreement with [your father] related to compensation. *** In the absence of a written agreement, your father's estate is entitled to *quantum meruit* as the means of calculating any compensation."

Masur also wrote that, while *quantum meruit* would warrant a fee of less than $20,000 because Murphy did very little work on the case, the firm would pay $150,000 to the estate out of "respect and admiration for your father."

¶ 11    Hodge testified at trial that he saw a copy of the 2004 agreement in June 2017, before Masur sent this letter. Although the copy he saw was unsigned, he believed that it had been signed and "was in effect," although he also believed that the agreement had terminated following Murphy's death. He also knew of Masur's letter offering the estate $150,000, and he spoke with the firm's other principals about the offer. He could not say for sure whether he mentioned the existence of the 2004 agreement to anyone at the firm; no one asked him about it. He testified that, in his opinion, the statement in Masur's letter that the firm "did not have a written agreement" with Murphy regarding compensation was accurate because, on the date of the letter, "there was no such agreement."

---

[1]On July 21, 2017, Masur confirmed that the case had in fact settled. Although the settlement was confidential, the trial court in this case relaxed the confidentiality provision. Under the settlement, the firm received a contingent fee of $2,333,333.33 plus $172,049.63 in litigation expenses. One third of the contingent fee—the amount that the estate asserts was due to it under the 2004 agreement—would be $777,777.77.

¶ 12    The estate retained different counsel who, on July 10, 2017, wrote Masur asserting that in fact the firm did have a written agreement with Murphy regarding compensation. Masur asked for a copy of the agreement, and the estate responded that he should have one already, as the firm had drafted the agreement. Masur then confirmed that the firm indeed had a copy of the 2004 agreement. (At trial, several principals testified that they could not find a copy of the 2004 agreement. Joseph Loran testified that he eventually found a signed copy in his desk, filed with unrelated documents.) On July 21, the firm again wrote to the estate, asserting for the first time that paragraph 4E of the 2004 agreement meant that its obligations to pay the estate anything terminated two months after Murphy died.

¶ 13    Thereafter, the firm filed an action (No. 17-MR-1142), seeking a declaratory judgment that the 2004 agreement had terminated on Murphy's death and that the firm had no obligation to pay his estate any amount from the Seyller settlement because the settlement proceeds were not received within two months of Murphy's death. The estate filed an action (No. 18-L-143) for breach of contract against both the firm and its individual principals, arguing that, under the 2004 agreement, the estate was owed $777,777.77 under paragraph 4B. By agreement, the two cases were consolidated for further proceedings and trial.

¶ 14    The firm filed a motion to dismiss the complaint as to the individual principals because the 2004 agreement was between Murphy and the firm, and there was no provision for individual liability. It also filed a motion for judgment on the pleadings, arguing that the 2004 agreement was unambiguous and that, by its terms, nothing was due to the estate. The trial court agreed with the firm and entered judgment in its favor. The trial court later granted the firm's motion to dismiss the individual principals from the breach of contract case, and denied the estate's motion to reconsider.

¶ 15    The estate appealed, and in *Murphy v. Kinnally Flaherty Krentz Loran Hodge & Masur, P.C.*, 2019 IL App (2d) 180757-U (*Murphy I*), we reversed the entry of judgment on the pleadings, finding that the contract was ambiguous. We began our analysis of this issue by noting:

> "A contract is ambiguous where there is doubt as to the true sense or meaning of the words themselves or an indefiniteness in the words' expression, resulting in a difficulty in the application of the words under the circumstances of the dispute that the contract is supposed to govern. *Central Illinois Light Co. v. Home Insurance Co.*, 213 Ill. 2d 141, 153 (2004). An ambiguity is not created merely because the parties disagree. *Thompson v. Gordon*, 241 Ill. 2d 428, 443 (2011). If no ambiguity exists in the language of the contract, the parties' intent must be derived from the writing itself as a matter of law. *Farm Credit Bank v. Whitlock*, 144 Ill. 2d 440, 447 (1991). If the terms of a contract are ambiguous, or capable of more than one interpretation, its construction is a question of fact and parol evidence is admissible to ascertain the parties' intent. *Id.* A contract should be examined as a whole and each provision should be given meaning and effect. *Thompson*, 241 Ill. 2d at 441." *Id.* ¶ 25.

After summarizing the parties' arguments, we found that the 2004 agreement was ambiguous: "Since paragraph 4E is susceptible to more than one reasonable interpretation, it is ambiguous and the determination of its meaning is a question of fact." *Id.* ¶ 30. We stated:

> "Our determination that the Agreement is ambiguous is supported by looking at other provisions of the Agreement. See *Thompson*, 241 Ill. 2d at 441 (a contract should be examined as a whole). Under section 6C, the Agreement would have terminated if one of the principals of the firm died. In the firm's interpretation of the Agreement, Attorney Murphy would not have been entitled to compensation from the Seyller case if the case did not settle and the contingency fee was not collected within two months of the principal's

death. Under the plaintiff's reading of the Agreement, Attorney Murphy would still be entitled to the compensation from the Seyller matter provided under the Agreement. Both interpretations of the Agreement are reasonable. Likewise, under section 6B, the Agreement would have terminated if the firm "ceased to exist" as a corporation or law partnership. By this provision would Attorney Murphy forfeit fees that could not be collected within two months? Or would the former firm accept such payments at a later time and disburse the appropriate compensation? For these reasons, the intended effect of paragraph 4E at the time the parties entered the Agreement is unclear." *Id.* ¶ 29.

¶ 16 As the 2004 agreement was ambiguous, we reversed the trial court's entry of judgment on the pleadings. We also affirmed the dismissal of the individual defendants and remanded for further proceedings.[2] *Id.* ¶ 40.

¶ 17 On remand, the firm moved to strike two exhibits from the estate's complaint: the February 2016 letter from Murphy to William, listing the *Seyller* case as one of the two matters at the firm in which he had an interest, and the June 30, 2017, letter from Masur to William, stating that the firm "did not have a written agreement" with Murphy about compensation. The firm acknowledged that extrinsic evidence could be considered in determining the intended meaning of ambiguous contract language but argued that such evidence properly included only (1) the parties' statements and the circumstances *surrounding the formation* of the contract and (2) conduct (but not statements) by the parties *after* the execution of the contract. It also argued that the February 2016 letter was inadmissible hearsay. The estate responded that both exhibits were relevant and admissible evidence of the parties' intent. In April 2021, the trial court granted the firm's motion

---

[2]On remand, the consolidated cases were assigned to a different judge due to the retirement of the previous judge.

to strike these two exhibits as well as paragraphs 16 and 23 of the complaint, which referred to those exhibits. The trial court later reconsidered its ruling as to Masur's June 2017 letter, however, and it was admitted at trial.

¶ 18    In a separate ruling, the trial court barred the estate from presenting to the jury any evidence related to the firm's representation of the estate, including the April 2017 e-mail exchange between William and Hodge. The trial court held that, although the evidence would be relevant to a claim for breach of fiduciary duty, the estate had not brought such a claim and the evidence was not relevant to the estate's breach of contract claim.

¶ 19    During discovery, the estate disclosed attorney Joseph A. Power, a noted plaintiffs' personal injury attorney, as an expert witness. The opinions to which Power would testify, based on his experience, knowledge, and training, included:

"l. No plaintiffs' personal injury lawyer would waive a contractually earned forwarding fee if the underlying case was not settled and dispersed [*sic*] within two months of his death.

2. The parties intended for the amendments to the 2004 Of Counsel Agreement to cure the 'Hupp problem' that arose under the 1999 Of Counsel Agreement.

3. The parties did not intend for the amendments to the 2004 Of Counsel Agreement to apply to contractual forwarding fees of a personal injury contingency fee case.

4. Forwarding fees owed to lawyers from personal injury contingency fee cases do not create uncertainty or long-term entanglements for law firms.

5. Under the 2004 Agreement, William C. Murphy was contractually obligated to forward the Seyller matter to the Law Firm.

6. Under the 2004 Agreement, William C. Murphy performed his contractual obligation by forwarding the Seyller matter to the Law Firm.

7. Under the 2004 Agreement, William C. Murphy earned and was entitled to a contractual one-third forwarding fee once he performed his contractual obligation.

8. Under the 2004 Agreement, the rights of William C. Murphy and his Estate to a contractual one-third forwarding fee from the Seyller matter vested when William C. Murphy brought the Seyller matter to the Law Firm and the Seyllers signed the Law Firm's representation agreement.

9. Under the 2004 Agreement, the entire $777,777.78 contractual fee owed by the Law Firm to the Estate of William C. Murphy should have been paid at the time the settlement funds were dispersed [*sic*].

10. None of the provisions of the 2004 Agreement extinguish or terminate the fee that William C. Murphy earned when he forwarded the Seyller matter to the Law Firm and that his Estate is still owed.

11. The Law Firm breached the 2004 Agreement by failing to pay the Estate of Bill Murphy the entire $777,777.78 contractual fee it was owed at the time the settlement funds were dispersed [*sic*]."

¶ 20   The firm brought a motion *in limine* to bar Power's testimony. It argued that, although expert testimony is admissible to help jurors understand terms in a contract if the language has a technical meaning or is beyond the knowledge and experience of the average juror, here the contract was simple and straightforward, without any terms of art. It also argued that, rather than illuminating the meaning of the contract, Power's opinions as disclosed attempted to substitute his conclusions about the contract for the jurors' own. The estate responded that Power was able to testify regarding customary business arrangements within the personal-injury contingent-fee area of legal practice and argued that his testimony would assist the jury. It pointed out that the trial court had already found that "contingent fee" was a term of art and that the firm had itself hired an

attorney to testify as an expert about the meaning of the contract. The trial court granted the firm's motion *in limine* and barred Power from testifying. It later denied a motion to reconsider both that ruling and its earlier ruling striking the February 2016 letter.

¶ 21 The estate filed a motion *in limine* of its own, arguing that, as the trial court had held that the February 2016 letter must be barred on the ground that it was Murphy's "post-contract, self-serving statement" and thus could not be used to prove the parties' prior intent, then the testimony of the surviving members of the firm about what they intended in 2004 should likewise be barred as "post-contract, self-serving statements." The trial court disagreed, saying:

"THE COURT: I think they get to testify to their intent because that's what they thought at the time they contracted.

*** Mr. Murphy, if he was alive, would be allowed to say something, too.

\* \* \*

MR. BILD: Well, but your Honor, that's sort of the problem that we raise in this motion.

THE COURT: I understand you have a problem, Counsel. I really do understand that. But you are not going to be creating or preventing the defense because you have a problem.

The fact of the matter is that they get to testify to their intent because they were there. That's not what they said afterwards. It is what they thought at the time. The fact that they are alive today doesn't change that. You are stuck with it.

MR. BILD: But your Honor, they wouldn't be testifying to statements they made before the contract was entered into. They wouldn't be testifying to that. They would be testifying to their current interpretation of what they intended in 2004.

THE COURT: And I believe they get to do that. And if you had a client who was here who was a party to the contract, so would that person be able to do so.

But we are not going to allow statements to third parties because that would be a hearsay statement, and that would be self-serving.

This is what is in their mind based on what they claim to be what they intended at the time. I can't change that.

MR. BILD: As to the hearsay statement, the—

THE COURT: So Counsel, I want to tell you something. You can keep talking. It doesn't make your record better. It just is more talking. And I am not going to change my mind on this.

So let's move on."

¶ 22    Prevented by the trial court's rulings from introducing Murphy's February 2016 letter, any expert testimony from Power regarding custom and practice in contingent fee cases, and also the testimony of Amy Seyller regarding work that Murphy actually performed relating to her case, the estate presented only the testimony of William and the six principals of the firm, calling the latter as adverse witnesses. The principals testified that their intent in entering into the 2004 agreement was to cut off all liability to pay Murphy anything two months after his death, regardless of the nature of the fees owed and whether such fees would have created a continuing obligation or only a one-time payment obligation.

¶ 23    The estate made offers of proof as to (a) the testimony that would have been offered by Power, established through the Illinois Supreme Court Rule 213(f) (eff. Jan. 1, 2018) disclosure and his deposition testimony; (b) the February 2016 letter, established through the testimony of

William; and (c) the April 2017 e-mail correspondence between William and Hodge, established through Hodge's testimony. The estate then rested its case.

¶ 24 The firm moved for a directed verdict. The estate argued that a directed verdict was not appropriate, pointing out that the firm's principals had conceded that the "Hupp problem" was the genesis of the revisions to the 1999 "of counsel" agreement that resulted in the 2004 agreement; the "Hupp problem" involved continuing obligations arising from retainers or other ongoing revenues and did not arise from a contingent-fee matter; that the substance of paragraph 4B, which did cover compensation for contingent-fee matters, was carried over unchanged from the 1999 agreement; and that Masur's June 2017 letter acknowledged that, in at least some form, Murphy had "an interest" in the Seyller case. Further, Masur's statement in that letter that there was no written agreement between the firm and Murphy, when in fact Hodge knew that there was such an agreement, suggested a dishonest intent to conceal the existence of the 2004 agreement, allowing the jury to conclude that the principals' testimony about their intent in including paragraph 4E was not to be believed.

¶ 25 The trial court granted the motion for a directed verdict. It noted that the applicable legal principles required it to take the evidence in the light most favorable to the estate. Summarizing the evidence, it noted that William's testimony established that "his dad was a great lawyer" whose name had been on the firm. During Murphy's lifetime, William "became aware of the fact that his dad claimed an interest in" the *Seyller* case.

¶ 26 The trial court said that "probably the most relevant testimony" was provided by Kinnally, Flaherty, Masur, and Hodge. Regarding the "Hupp problem," the evidence showed:

> "The Hupp problem, as it has been referred to on many occasions, according to the witnesses was the problem of having ongoing and extended financial obligations to parties who are no longer contributing members to the firm.

* * *

They wished to alleviate that problem. They wished to both provide for additional means of terminating a contract, because the original contract *** only had one method of termination, and that was *** upon 90 days written notice to either party by the other.

And as a result, in Mr. Hupp's case, because of the Paragraph 6 retainer obligation, they were required because they were apparently still doing Fox Valley Park District work and still receiving an annual retainer, they're obligated to give Mr. Murphy (sic) and his estate one-half of that. ***

***

And then second, they wished to create a limited period by which their obligation to compensate would continue post termination. And in this case, *it is clear by the language of the contract*, they agreed that time would be 60 days.

Plaintiffs argue that they presented evidence, for example, in the letter by Mr. Masur, indicating [the firm] agreed *** that Mr. Murphy had an interest. Well, that is actually plaintiff's characterization of the evidence, but it is not a reasonable description of the testimony.

*The testimony is unequivocally clear, and no trier of fact could reach a different conclusion* that [*sic*] the language of the letter was merely explaining their position at the time.

***

At best, the Masur letter undermines the testimony of the principals of the defendant's law firm or offers potential impeachment. But offering potential impeachment doesn't relieve the plaintiff of its obligation to then present substantive evidence to counter the testimony they sought to impeach.

If all they are left with is the defendant's version of the contract, merely because you raise a question as to whether or not they are being a hundred percent truthful, doesn't offer the fact finder an alternative." (Emphasis added.)

¶ 27 The trial court declared that "Plaintiff's interpretation of the contract quite frankly makes absolutely no sense, both in light of the language of the contract, the reasons for which it was created and the manner in which it was constructed." It then went through each provision of paragraph 4 of the 2004 agreement, noting that many of the provisions were carried over from the 1999 agreement but paragraph 4E was new. It found that paragraph 4E was consistent with testimony of the firm's principals that they wished to have finality once the agreement was terminated. It concluded by saying that the estate's argument that, under paragraph 4B, once Murphy referred the Seyller case to the firm, Murphy was entitled to receive the designated share when the firm collected its fee, was "sadly wholly made up of speculation and is not, in fact, supported by any evidence they have presented." It was "a stretch of the imagination to think that these parties, who I have learned are all highly accomplished lawyers, would sit down and construct an agreement with Paragraphs 4A, B, C, D and E, and think somehow that 4E in no way related to the paragraphs preceding it."

¶ 28 The trial court then impugned Murphy, suggesting without any evidence that "he later ***, having at age 90 realized how lucrative the Seyller case had become, *** suddenly rethought what he thought his interest should be" and stating that it was "not surprised that Mr. Murphy at age 90, when he realized what the Seyller case was worth, thought to himself, maybe that agreement wasn't as good of an agreement as I thought." It finished by finding that there was "no substantive evidence to support the inferences and arguments raised by" the estate and that the estate had "failed to present any competent evidence to support its claim." Saying that it was "sorry, but I

don't know that any finder of fact would come to any other conclusion," it entered a directed verdict for the firm.

¶ 29    The estate filed a timely appeal.

¶ 30                                ANALYSIS

¶ 31                        A. Jurisdiction and Forfeiture

¶ 32    Before turning to the substance of the issues raised, we first address the scope of our review in this appeal. *Lebron v. Gottlieb Memorial Hospital*, 237 Ill. 2d 217, 251-52 (2010). The firm argues that, because the estate's opening brief did not specifically refer to the trial court's entry of declaratory judgment in favor of the firm, the estate has forfeited its ability to contest that judgment. We reject this argument as inconsistent with the procedural history of this case.

¶ 33    As noted earlier, the firm filed an action for declaratory judgment, seeking a declaration that it owed no fees to Murphy or the estate under the 2004 agreement. Several months later, after the estate had sought the payment of the fee that it contended was due under the 2004 agreement and the firm had refused to pay, the estate filed its action for breach of contract. Both actions indisputably centered on the issue of the correct interpretation of the 2004 agreement. The two actions were consolidated, and both proceeded together.

¶ 34    When we reversed the trial court's entry of judgment on the pleadings in the previous appeal on the basis that the 2004 agreement was ambiguous and thus extrinsic evidence could be offered, our holding also precluded the disposition of the declaratory judgment action without a trial. The trial court recognized this in the pretrial hearing, stating that, under our decision, it could not render its own judgment in the declaratory judgment case and instead must await the jury's verdict in the breach of contract action:

    "The jury is the only person or persons who will opine as to the meaning of the contract. And your [declaratory judgment] action is asking the Court to do that. I can't.

***

So I'm not sure from a legal standpoint where that puts the [declaratory judgment] action. But I think that we're gonna have to see what the jury says or what the evidence is in the contract action."

As the trial court correctly noted, because the jury would be the finder of fact regarding the parties' intent in entering into the 2004 agreement, the trial court's entry of any declaratory judgment would depend on the outcome of the jury trial. See *Mayfair Construction Co. v. Waveland Associates Phase I Ltd. Partnership*, 249 Ill. App. 3d 188, 199 (1993).

¶ 35    On January 10, 2023, after granting a directed verdict in the contract action, the trial court entered an order stating without elaboration that judgment was entered in favor of the firm. On January 19, 2023, the trial court entered an order modifying its earlier order *nunc pro tunc* to state in a more complete fashion that judgment was entered "in favor of the Kinnally firm on all issues and cases listed, including 18 L 143, 17 MR 1142, and 16 P 131." That is the order from which the estate appealed. Because that order entered judgment in both the declaratory judgment and contract actions, we have jurisdiction to entertain an appeal that addresses both.

¶ 36    Moreover, because the declaratory judgment action was, by the time of trial, wholly dependent on and controlled by the outcome of the trial on the contract action, the estate's arguments on appeal apply equally to the declaratory judgment action. We reject the contention that the estate forfeited any challenge to the declaratory judgment in the firm's favor merely because the estate did not specifically say that its arguments relating to the contract action also affect the validity of the declaratory judgment. Having clarified the scope of our review in this appeal, we now turn to the arguments raised by the parties.

¶ 37                              B. Evidentiary Rulings

- 17 -

¶ 38    On appeal, the estate asserts that the trial court erred in its evidentiary rulings in three areas: (a) barring the February 2016 letter, (b) barring evidence relating to Hodge's representation of the estate and the April 2017 e-mails between Hodge and William, and (c) barring Power's expert testimony. The estate also asserts that the trial court's entry of a directed verdict was improper and unwarranted. Finally, the estate asserts that the trial court displayed such bias against the estate that any new trial on remand should proceed before a different judge. We begin by addressing the trial court's evidentiary rulings.

¶ 39                    1. *February 2016 Letter*

¶ 40    The estate contends that the trial court erred in excluding the February 2016 letter from Murphy to William, because it was relevant evidence of the parties' own interpretation of the 2004 agreement. "The basic rule is that all relevant evidence is admissible unless otherwise provided by law." *People v. Cruz*, 162 Ill. 2d 314, 348 (1994). Relevant evidence is evidence that tends to make the existence of any fact material to the determination of the case either more probable or less probable. *People v. Harvey*, 211 Ill. 2d 368, 392 (2004). However, a trial court may exclude evidence on the grounds of irrelevancy if it "has little probative value due to its remoteness, uncertainty, or possibly unfair prejudicial nature." *Id.* The determination of whether evidence is admissible is within the sound discretion of the trial court, and we will not reverse that determination unless the court has abused that discretion. *People v. Montano*, 2017 IL App (2d) 140326, ¶ 74. A trial court abuses its discretion when its ruling is arbitrary, fanciful, or unreasonable, or no reasonable person would take the view adopted by the trial court, or when its ruling rests on an error of law. *People v. Olsen*, 2015 IL App (2d) 140267, ¶ 11.

¶ 41    We agree with the estate that Murphy's February 2016 letter to William was relevant to the primary issue in the case, which was the proper interpretation of the 2004 agreement. "Evidence is relevant if it tends to prove a fact in controversy or render a matter in issue more or

less probable." *In re A.W.*, 231 Ill. 2d 241, 256 (2008). Here, the February 2016 letter, which stated that (1) Murphy's relationship with the firm was governed by the 2004 agreement and (2) Murphy believed that he had an interest in the *Seyller* case that could result in fees under that agreement, was clearly relevant to this issue.

¶ 42     In our previous decision in this case, we held that the intended effect of paragraph 4E was unclear and was susceptible to differing interpretations, and thus the contract language was ambiguous. *Murphy I*, 2019 IL App (2d) 180757-U, ¶ 28. Further, paragraph 4E had to be interpreted in light of the rest of the agreement, including paragraphs 4B and 6C. *Id.* ¶ 29. As the firm itself acknowledges, extrinsic evidence may be considered in determining the intended meaning of ambiguous contract language. *Szafranski v. Dunston*, 2015 IL App (1st) 122975-B, ¶ 75. The February 2016 letter is such extrinsic evidence.

¶ 43     The sole argument[3] raised by the firm to the contrary is that the letter is irrelevant and therefore inadmissible. In making this argument, however, the firm confuses the concept of relevancy with the separate issue of the probative value of evidence.

¶ 44     The firm argues that only limited extrinsic evidence of parties' contractual intent can be admitted. Evidence of the parties' statements and actions prior to the formation of the contract and

---

[3]The firm notes that, before the trial court, it also argued that the February 2016 letter was hearsay, and it says that it "maintains" that argument. But on appeal it does not actually make any such argument or include any citation to authority in support of such an argument. We therefore find its bare contention that the letter was hearsay to have been forfeited. Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020); *People ex rel. Illinois Department of Labor v. E.R.H. Enterprises, Inc.*, 2013 IL 115106, ¶ 56 (where a party does not offer any argument or meaningful authority in support of an argument, the argument is forfeited).

the circumstances surrounding the execution of the contract are generally considered relevant and admissible, but the firm insists that postformation evidence must be more tightly limited. In particular, it argues that Illinois courts draw a sharp distinction between *conduct* and *statements* that take place after the contract's formation, allowing evidence of the first but not the second. The trial court relied on this supposed distinction in barring the February 2016 letter as well as in several other of its evidentiary rulings.

¶ 45    This distinction is not supported by the case law. The firm cites four cases, but all of them simply state that evidence of postformation acts or conduct is relevant and admissible, without addressing postformation *statements* at all. See *Shapich v. CIBC Bank USA*, 2018 IL App (1st) 172601, ¶ 22 (postformation conduct is relevant); *Szafranski*, 2015 IL App (1st) 122975-B, ¶ 102 (postformation conduct is relevant); *Village of South Elgin v. Waste Management of Illinois, Inc.*, 348 Ill. App. 3d 929, 941 (2004) (party actions are relevant); *Vole, Inc. v. Georgacopoulos*, 181 Ill. App. 3d 1012, 1021 (1989) (subsequent acts are relevant). We can find no support in these cases for any bright-line rule prohibiting evidence of a party's statements made after the formation of a contract if those statements are otherwise relevant.

¶ 46    The only possible support for this "conduct versus statements" distinction is a federal case, *Lexington Insurance Co. v. RLI Insurance Co.*, 949 F.3d 1015 (7th Cir. 2020). In that case, the court stated that, "[a]s a matter of Illinois law and common sense, the parties' statements during negotiations and their conduct afterward carry more weight than legal interpretations offered in the run-up to litigation." *Id* at 1025 (citing *Szafranski*, 2015 IL App (1st) 122975-B, ¶ 102). We have no quarrel with this statement, but it clearly relates to the *weight* to be given to various types of evidence, not whether that evidence is *admissible*. Thus, it does not support barring evidence such as the February 2016 letter entirely; it merely notes that postformation evidence may carry less weight with a jury. Further, the distinction it draws relates primarily to whether the particular

statements were made in anticipation of litigation. Here, there is no indication that Murphy anticipated any litigation between his estate and the firm when he wrote his February 2016 letter. To the contrary, the letter states that the sharing of referrals and the payment of forwarding fees had worked well with no problems. Nothing in this statement from *Lexington* provides a basis for the exclusion of the February 2016 letter.

¶ 47    The *Lexington* decision included one other passage that the firm relies on to support the supposed distinction between postformation *conduct* and *statements*. In rejecting one party's request that the court consider a postformation statement interpreting the contract (made after litigation was clearly a possibility), the court declared that "Illinois courts clarify ambiguous contract language based on general circumstances around contract formation but only actual conduct subsequent to formation," and held that the parties' later statements about the contract were "not conduct." *Id.* at 1029. However, the only support cited by the federal court for this statement was *Szafranski*, and, as we have discussed, *Szafranski* itself nowhere states that postformation statements are not admissible. Thus, this sentence misstates Illinois law.

¶ 48    The pronouncements of federal courts regarding Illinois law are only persuasive, not binding. *Findlay v. Chicago Title Insurance Co.*, 2022 IL App (1st) 210889, ¶ 63. Given that it misstates Illinois law, we do not find this passage from *Lexington* to have even persuasive value.

¶ 49    Finally, we note that the *Lexington* court itself found several postformation statements by the parties in that case to be both relevant and reliable. See *Lexington*, 949 F.3d at 1026-27 (referring to postformation statements about the purpose of a contract provision and finding postformation statements made to a third party regarding one party's understanding of the contract to be reliable evidence, as the statements were made before the current dispute arose). Murphy's February 2016 letter was a similar postformation statement made to a third party (William) well before there was any hint of litigation between Murphy and the firm. Thus, *Lexington* actually

supports the estate's argument that the letter should have been admitted. Because the trial court's decision to bar the admission of the letter rested on an error of law (the incorrect belief that postformation statements are inadmissible under Illinois law), it was an abuse of discretion. *Olsen*, 2015 IL App (2d) 140267, ¶ 11.

¶ 50    If the lack of case law supporting the exclusion of the letter were not enough, we also note that the trial court disregarded its own "rule" about excluding "post-contract, self-serving statements" by permitting all of the firm's principals to testify about their own understanding of the intent behind the contract's ambiguous language. Doing so was manifestly unfair to the estate. For all of these reasons, we conclude that the trial court abused its discretion in excluding the February 2016 letter.

¶ 51                                            *2. April 2017 E-mails*

¶ 52    The firm brought motions *in limine* that sought to (1) prohibit the estate from referring to any potential breach of fiduciary duty by the firm during the period in 2017 when Hodge represented the estate and (2) bar the admission of the April 2017 e-mail exchange between Hodge and William. The trial court granted the first request on the basis that the estate had not pled any claim for breach of fiduciary duty. It granted the second request, saying that it did not believe that the e-mails were admissible and that the e-mails "would only tend to confuse the jury as to the facts in this case." The estate contends that these rulings were an abuse of discretion.

¶ 53    We find no abuse of discretion in the trial court's determination that, as no breach of fiduciary duty claim had been pled, evidence that was solely relevant to such a claim could be excluded. The estate argues that evidence that the firm was representing the estate, and thus owed a fiduciary duty to assist the estate in gathering potential assets, makes the firm's denial that the 2004 agreement existed even more egregious. This greater degree of misconduct could affect the jury's view of the firm's principals' credibility. However, the estate overlooks the fact that the

most powerful evidence of the firm's potential misconduct was the June 2017 letter itself, which was admitted into evidence. The estate was able to, and did, use that letter to attack the credibility of the firm's principals. We also note that the estate was able to elicit testimony from the principals regarding their purported inability to locate the 2004 agreement and their denial of its existence despite Hodges' admission that he knew of it and had recently reviewed it. When considered in light of the evidence that the trial court did permit, we cannot conclude that the trial court abused its discretion by excluding evidence that was solely relevant to a breach of fiduciary duty claim.

¶ 54 The exclusion of the April 2017 e-mail exchange between Hodge and William is a different matter, however. The trial court excluded these e-mails on the grounds that they were inadmissible and would confuse the jury. As to the latter justification, there is no explanation in the record for why the e-mails would confuse the jury, and we cannot discern any such reason. As for the first justification, the only reason argued by the firm for why the e-mails would be inadmissible is relevancy. The e-mails are clearly relevant to the dispute, however. See *Harvey*, 211 Ill. 2d at 392; Ill. R. Evid. 401 (eff. Jan. 1, 2011). The e-mails arguably showed that Hodge was aware that the estate was asking about the *Seyller* case and that he was willing to provide some information about the case. This evidence could have permitted the estate to argue to the jury that Hodge's response was a tacit admission that the estate had a legitimate interest in the case. The e-mails also could provide reinforcement for the estate's contention that the June 2017 letter contained the same implicit concession, as that letter voluntarily informed the estate of the Seyller settlement and referred to Murphy's "interest" in the case. (Of course, the firm argues a contrary interpretation of the e-mails and the June 2017 letter. We do not express an opinion on the correct interpretation of these items; any such credibility judgment would be for the jury.) Both of these items were relevant to impeach the credibility of the firm's principals regarding the intended meaning of the 2004

agreement. Accordingly, the April 2017 e-mails should not have been excluded. See Ill. R. Evid. 402 (eff. Jan. 1, 2011).

¶ 55                            3. *Expert Testimony of Power*

¶ 56    The final evidentiary ruling challenged by the estate is the trial court's barring of the estate's expert witness, Power. That ruling came in response to a motion *in limine* seeking to bar Power's testimony on the grounds that it was unnecessary because the jury could understand the language of the 2004 agreement without assistance, and his opinions went beyond the scope of proper testimony in a contract case as he would opine that the estate was due a fee in the *Seyller* case under the terms of the agreement. The firm also argued that Power's opinions were based solely on the February 2016 letter (which had been barred) and that he used the phrase "forwarding fee" to describe the compensation allegedly due to Murphy but the 2004 agreement itself did not use that term.

¶ 57    The estate responded that the legal standard was whether expert testimony could assist the jury, not whether it was necessary, and it noted that Illinois law did not bar expert testimony on an "ultimate issue" such as the proper interpretation of an ambiguous contract. It also refuted the firm's other arguments, pointing out that Power's testimony was based on his knowledge, experience, and training as well as the letter, and that Power explained what he meant by "forwarding fee" in his deposition. (We note that Murphy also referred to "forwarding" the Seyller case to the firm in his February 2016 letter, so that language was clearly relevant to the issue of the parties' understanding of the 2004 agreement.)

¶ 58    In issuing its ruling, the trial court began by stating that the February 2016 letter was "incompetent as a matter of law" and thus any reliance by Power[4] on the letter "called into question his qualifications to even qualify as an expert." The trial court then noted that, when a contract is ambiguous, expert testimony is admissible if the language to be interpreted is beyond the knowledge and experience of the average juror. Thus, it said, the issue was, "does this contract require expert testimony," and its answer was no:

> "This contract is made of plain and ordinary language with perhaps maybe one exception, 'contingency fee.' But the word 'contingency fee' in no way becomes part of the contract that needs to be interpreted. That's the ambiguity found by the Appellate Court in section 4(e).
>
> Which, I must confess, much like Judge Akemann [(the previous judge who entered the judgment on the pleadings that this court reversed)], I don't see the ambiguity. I read the Appellate Court decision over and over. And with all due respect, I don't understand the difference they are trying to draw.
>
> I think the language is clear as day. But the law of the case is[,] it is not. But the language is something an ordinary person can discern without the assistance of expert testimony."

After commenting that "all of the other opinions" rendered by Power were "irrelevant," the trial court granted the motion and barred his testimony.

¶ 59    The estate asked the trial court to reconsider its decision, contending that the meaning of the word "collected" as used in paragraph 4E could not be understood without an understanding

---

[4]For unknown reasons, the trial court erroneously referred to Power as "Mr. Brown" throughout the hearing on this motion.

of the term "contingent fee" and how such fees are collected. Power would testify to the industry customs and standards regarding fees owed on cases involving contingent fee contracts. The estate also pointed out that the opposing side had also retained an expert witness to testify about whether paragraph 4E was intended to apply to contingent fees, an implicit admission that this was an appropriate area for expert testimony. Arguing that Illinois case law overwhelmingly supported the admission of extrinsic evidence such as expert testimony to assist the jury in interpreting ambiguous contract language, the estate cited a dozen cases for this point.

¶ 60    The trial court denied the motion to reconsider. Saying that the motion "reads like, [Judge], we think you are stupid," it demanded to know who had authored the motion. It then commented that, although this court had found the language of the 2004 agreement to be ambiguous, it did not believe that our decision meant that the case required evidence about contingent fees:

> "They [(the appellate court)] never alluded to the fact that the ambiguity was because of the contingency fee. They just felt that 4(e) could be read in different ways. I still struggle to understand the difference.
>
> But they found it ambiguous. And so you will have to try to determine if a jury can resolve that ambiguity.
>
> But the ambiguity is in paragraph 4(e). And there is nothing to do with contingency fees. And contrary to the case law you have provided, expert opinion would not assist the finder of fact in any way in resolving that ambiguity."

¶ 61    The estate argues that whether the term "collected" as used in paragraph 4E of the 2004 agreement applied to contingent fee arrangements was the very ambiguity that we found in our previous decision, and thus it does not matter whether the term "contingent fee" is found in that paragraph. We agree. Our decision in *Murphy I* repeatedly referenced the principle that "[a] contract should be examined as a whole" and noted that our determination that the 2004 agreement

was ambiguous was "supported by looking at other provisions" of that agreement. *Murphy I*, 2019 IL App (2d) 180757-U, ¶¶ 25, 29. The question is whether Power's testimony could provide relevant and helpful information to the jury about the context in which the 2004 agreement was formed, not whether a particular term was used in paragraph 4E.

¶ 62 The way that legal professionals view contingent-fee cases, and the manner in which the fees are collected in such cases, are directly relevant to the proper interpretation of the 2004 agreement and the intended interaction of paragraphs 4B and 4E. Moreover, this is specialized knowledge that the average juror would not be expected to possess. Thus, it is a proper subject of expert testimony. See *American College of Surgeons v. Lumbermens Mutual Casualty Co.*, 142 Ill. App. 3d 680, 701 (1986). Nor is there any bar to Power's testimony simply because it addresses the "ultimate issue" to be resolved by the jury, namely, how to interpret the 2004 agreement. See *id.* The trial court abused its discretion in barring Power's expert testimony.

¶ 63 Having said this, we note that Power's disclosed opinions include a variety of matters, some of which may be subject to attack on other grounds. We merely determine that the trial court's stated reasons for barring Power's testimony in its entirety are invalid, without commenting on any individual opinion rendered by Power.

¶ 64 The firm argues that the estate forfeited the argument that Power's testimony would shed light on professional legal custom and practice with respect to contingent-fee cases, saying that the estate failed to raise this argument before the trial court and in fact expressly disclaimed it. The estate rebuts this argument with multiple citations to the record demonstrating that it raised this argument repeatedly. Our review of the record persuades us that the estate did preserve this argument and that it was not forfeited.

¶ 65                                   C. Entry of Directed Verdict

¶ 66 We now come to the central issue in this appeal, whether the trial court's entry of a directed verdict was proper. The estate argues that the trial court's action was improper for two reasons: first, the "lack of substantive evidence" cited by the trial court was the product of the court's own erroneous evidentiary rulings that excluded much of the evidence that the estate wished to introduce, and second, the trial court improperly assumed the role of fact finder, making determinations of factual issues such as intent. We agree with both arguments.

¶ 67 A motion for a directed verdict is governed by the same standard as a motion for a judgment *non obstante veredicto* or judgment *n.o.v. Pedrick v. Peoria & Eastern R.R. Co.*, 37 Ill. 2d 494, 498 (1967). Such motions should be granted only where "all of the evidence so overwhelmingly favors the movant that no contrary verdict based on that evidence could ever stand." *Krywin v. Chicago Transit Authority*, 238 Ill. 2d 215, 225 (2010). A motion for a directed verdict presents "only a question of law as to whether, when all of the evidence is considered, together with all reasonable inferences from it in its aspect most favorable to the plaintiffs, there is a total failure or lack of evidence to prove any necessary element of the plaintiffs' case." *Merlo v. Public Service Co. of Northern Illinois*, 381 Ill. 300, 311 (1942); see *Lawlor v. North American Corp. of Illinois*, 2012 IL 112530, ¶ 37; *York v. Rush-Presbyterian-St. Luke's Medical Center*, 222 Ill. 2d 147, 178 (2006). The standard for the entry of a directed verdict "is a high one and is not appropriate if reasonable minds might differ as to inferences or conclusions to be drawn from the facts presented." (Internal quotation marks omitted.) *Lawlor*, 2012 IL 112530, ¶ 37. We review *de novo* a trial court's grant of a directed verdict. *Id.*

¶ 68 Given our conclusion that the trial court should not have excluded key evidence in this case such as the February 2016 letter and Power's expert testimony, we have no difficulty in concluding that its entry of a directed verdict was error, because its finding that the estate had not "presented substantive evidence" could not be sustained if the correct evidentiary rulings had been made.

There would not have been "a total failure or lack of evidence" to prove the estate's case (*Merlo*, 381 Ill. at 311) if the estate had been able to introduce that evidence.

¶ 69    The trial court's comments also support the estate's second contention, that the trial court improperly substituted its judgment for that of the jury. It made factual findings regarding the parties' intent in entering into the 2004 agreement (including presuming to know the mind of the deceased Murphy), although intent is a factual issue that must be determined by a jury. *Arbogast v. Chicago Cubs Baseball Club, LLC*, 2021 IL App (1st) 210526, ¶ 19. Despite this court having found that the 2004 agreement was ambiguous because both parties' interpretations of the interaction between paragraphs 4B and 4E were reasonable, the trial court entered a directed verdict premised on its own belief that the estate's interpretation was *un*reasonable and "quite frankly makes absolutely no sense." The trial court's comments also show that it improperly made credibility determinations, finding that the June 2017 letter denying the existence of the 2004 agreement did not undermine the credibility of the principals' testimony about that agreement. For all of these reasons, the directed verdict entered by the trial court must be vacated and the matter must be remanded for a new trial.

¶ 70                    D. Reassignment Upon Remand

¶ 71    The estate's final request is that, if we vacate the judgment entered by the trial court in these consolidated cases, we order reassignment to a different judge on remand. The estate points out that we have the power to take this step under Illinois Supreme Court Rule 366(a)(5) (eff. Feb. 1, 1994). See *Eychaner v. Gross*, 202 Ill. 2d 228, 279 (2002).

¶ 72    "Judges *** are presumed impartial, and the burden of overcoming the presumption by showing prejudicial trial conduct or personal bias rests on the party making the charge." *In re Marriage of O'Brien*, 2011 IL 109039, ¶ 31. Nevertheless, where the trial court "has already ruled that no contrary verdict could ever stand and *** the judge has expressed a disregard for the

evidence presented, it would be essentially worthless to send the case back to the same judge." *People v. Serrano*, 2016 IL App (1st) 133493, ¶ 45; see *People v. Montanez*, 2016 IL App (1st) 133726, ¶ 44 (reassignment on remand warranted where trial judge "turned a blind eye to much of the evidence" and "gave the impression that it was flatly unwilling to consider" the appellant's evidence).

¶ 73    Unfortunately, the record here is replete with instances demonstrating that the trial court met the literal definition of "prejudiced," *i.e.*, that it had prejudged the issues in the case and would not keep an open mind. Early and often, the trial court voiced a view of the case that led it to erroneously bar relevant evidence of contractual intent (Murphy's February 2016 letter to William, who was to be the executor of his estate, and Power's expert testimony) while unfairly allowing the firm's principals to testify on the same issue. In granting the motion for a directed verdict, it then discussed Murphy's February 2016 letter at length, making unsupported statements about Murphy's thoughts at the time, and it did this despite the fact that it had ruled the letter inadmissible and thus should not have considered it at all.

¶ 74    The trial court also repeatedly expressed its disagreement with our holding that the 2004 agreement was ambiguous, saying, "I don't see the ambiguity. I read the Appellate Court decision over and over. And with all due respect, I don't understand the difference they are trying to draw. *** I think the language is clear as day." Its failure to adhere to the law of the case ultimately led it to take the case from the jury without cause, simply based on its own view that "no trier of fact could reach a different conclusion." Under these circumstances, where the trial judge has so clearly communicated its belief that only one outcome is possible despite contrary evidence and law, we believe that the interests of justice are best served by remanding the case to be heard by a different trial judge, "to remove any suggestion of unfairness." *People v. Dameron*, 196 Ill. 2d 156, 179 (2001).

¶ 75                              CONCLUSION

¶ 76     For the foregoing reasons, the judgment of the circuit court of Kane County is vacated and the cause is remanded to the chief judge of the circuit court for reassignment to a new judge to preside over further proceedings consistent with this decision.

¶ 77     Vacated and remanded with directions.

*Murphy v. Kinnally Flaherty Krentz Loran Hodge & Masur, P.C.*, **2023 IL App (2d) 230019**

| **Decision Under Review:** | Appeal from the Circuit Court of Kane County, Nos. 17-MR-1142, 18-L-143; the Hon. Kevin T. Busch, Judge, presiding. |
|---|---|
| **Attorneys for Appellant:** | Michael T. Reagan, of Ottawa, and Thomas A. Demetrio, Michael D. Ditore, and Mitchell W. Bild, of Corboy & Demetrio, P.C., of Chicago, for appellant. |
| **Attorneys for Appellee:** | Daniel F. Konicek and Amanda J. Hamilton, of Konicek & Dillon, P.C., of Geneva, and Patrick M. Flaherty, of Kinnally Flaherty Krentz Loran Hodge & Masur, P.C., of Aurora, for appellee. |