2025 IL App (2d) 240320-U
No. 2-24-0320
Order filed February 25, 2025

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| ANDREW JANOVSKI and CHICAGO TITLE AND LAND TRUST 3503, | ) ) ) | Appeal from the Circuit Court of McHenry County. |
| Plaintiffs-Appellees, | ) ) | |
| v. | ) ) | No. 23-MR-101 |
| NICKOLAS JANOVSKI, | ) ) | Honorable Joel D. Berg, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE HUTCHINSON delivered the judgment of the court.
Presiding Justice Kennedy and Justice Schostok concurred in the judgment.

**ORDER**

¶ 1  *Held*: Defendant's various challenges to the trial court's order rescinding a lease agreement as unconscionable are either forfeited for failure to comply with briefing rules or lack merit.

¶ 2  Plaintiff Andrew Janovski and defendant, Nickolas Janovski, are brothers. In 2012, their mother, Thanam Lakshmi Paramanandhan, owned 100% of the beneficial interest in plaintiff Chicago Title and Land Trust 3503 (Land Trust 3503), which was the holder of legal title to property located at 9033 Winn Road in Spring Grove (the property). Early in 2012, Thanam and Nickolas purportedly entered into a 20-year residential lease agreement (the lease agreement) for

the property. When Thanam died in 2014, Andrew became the owner of 100% of the beneficial interest in Land Trust 3503. Andrew first learned of the lease agreement in March 2023.

¶ 3    On June 20, 2023, plaintiffs filed a complaint for a declaratory judgment. Plaintiffs asked the trial court to find that Thanam was not competent to sign the lease agreement and, alternatively, that the lease agreement was commercially absurd, lacked consideration, and should be rescinded. On April 22, 2024, following a bench trial, the court rescinded the lease agreement, finding that it was unconscionable and lacked consideration. Nickolas timely appealed.

¶ 4    Nickolas, appearing *pro se*, raises five arguments on appeal; the first three challenge certain evidentiary rulings made by the trial court during the bench trial; the fourth claims the trial court was biased against him because he acted *pro se*; and the fifth claims that the court "incorrectly applied precedent" in determining that the lease agreement should be rescinded. None of Nickolas's arguments has merit. Accordingly, we affirm.

¶ 5    I. BACKGROUND

¶ 6    A. Complaint and Answer

¶ 7    Paragraphs one through ten of the complaint (which Nickolas admitted in his answer) alleged that Land Trust 3503 was the legal title holder of the property under a trust agreement entered into between Palatine National Bank and Thanam on October 30, 1980 (the trust agreement). Thanam retained a 100% beneficial interest in the property. On May 15, 2000, Thanam executed a trust amendment providing that Andrew would be the successor owner of the 100% beneficial interest. When Thanam died on December 24, 2014, Andrew became the owner of the entire beneficial interest. Thanam resided on the property from the 1990s until her death. Nickolas resided in Wisconsin for 10 years until late 2013, when he lost ownership of his property through foreclosure and subsequently resided at the property with Thanam.

¶ 8 In further paragraphs, the complaint alleged that the lease agreement between Nickolas and Thanam, attached as exhibit A, was invalid and unenforceable for various reasons. The "Rent" provision required a one-time $100 payment from Nickolas and further stated:

"A. Tenant shall provide health care assistance, end of life care assistance, and any other assistance deemed necessary by the Landlord in lieu of cash rent. Tenant will not receive cash payment for any labor or for expenses incurred in taking care of the Landlord. Tenant will receive Lease in lieu of cash payments.

B. Tenant's duties shall include taking Landlord to appointments, grocery shopping, laundry, and any other duties deemed necessary by the Landlord. Tenant will receive Lease in lieu of cash payments."

Thanam and Nickolas signed the lease agreement on January 28, 2012.

¶ 9 The complaint alleged that the lease agreement was "commercially absurd and lacked consideration" in that it provided (1) "for a twenty (20) year lease with payment of only $100.00 total rent"; (2) "that the lease may not be terminated, cancelled or otherwise changed by the landlord under any circumstances"; (3) "that the landlord is prohibited from defaulting the lease"; (4) "that if the landlord were required to hire an attorney, the landlord is responsible for all expenses incurred by the landlord in doing same"; (5) "that the landlord shall not have the right to terminate the lease before the end of the term"; and (6) "that the landlord is prohibited from making any type of retaliatory acts against the tenant and if so, shall be subject to pay the tenant $500.00 per day for the length of the retaliation." In addition, the lease agreement "[did] not give the landlord, [Nickolas's] mother, who has been living in her house for more than 20 years, the right to continue to live on the property." Moreover, the lease agreement was not recorded in McHenry County or signed by Land Trust 3503.

¶ 10    The complaint also alleged that Andrew was appointed temporary guardian of Thanam on April 17, 2013, and was appointed her permanent guardian on May 13, 2013. According to the complaint, the order adjudicating Thanam disabled found her "incapable of managing her own personal, medical, and financial affairs as she suffers from dimentia [*sic*] with psychosis, confusion, poor insight and judgment, and paranoid delusion." Thus, plaintiffs alleged that, even if Thanam actually signed the lease agreement, she was incompetent to enter into a binding agreement at that time.

¶ 11    On July 17, 2023, Nickolas filed a *pro se* appearance and an answer. As is relevant here, and as noted above, Nickolas's answer admitted paragraphs one through ten of the complaint. On July 18, 2023, and August 1, 2023, Nickolas filed a "Request for Documents." On August 29, 2023, Nickolas filed a "Request for Discovery."

¶ 12                         B. Summary Judgment Proceedings

¶ 13    On January 5, 2024, Nickolas filed a motion for summary judgment, arguing that plaintiffs failed to provide medical evidence that Thanam was "mentally unfit or otherwise mentally impaired." Nickolas further argued that, on November 9, 2023, Andrew sent Nickolas several e-mails "demanding that [Nickolas] comply with the terms of the lease." According to Nickolas, the e-mails constituted admissions that the lease agreement was valid, thus "making his claim for a declaratory judgment moot."

¶ 14    In response, Andrew asserted that Thanam's incompetency was but one allegation to support the claim that the lease agreement was invalid. Andrew stated that, in any event, Thanam's incompetency raised a question of fact that precluded summary judgment. Andrew also asserted that the e-mails were not judicial admissions but were at most admissible to show the parties' beliefs about the lease agreement. Indeed, what the parties believed about the lease agreement

posed a question of fact that precluded summary judgment. Andrew further noted that Nickolas's motion ignored other allegations in the complaint, including that the lease agreement was unconscionable and thus unenforceable.

¶ 15    On March 13, 2024, following a hearing, the trial court denied Nickolas's motion for summary judgment. The court's written order stated that the matter was before the court "for hearing" on the motion and that the court denied the motion after "having considered the pleadings and hearing arguments of [d]efendant and counsel for [p]laintiff[s]." The record does not contain a report of proceedings for the hearing.

¶ 16                              C. Bench Trial

¶ 17    On April 18, 2024, the matter proceeded to a bench trial. Plaintiffs were represented by counsel, and Nickolas was *pro se*.

¶ 18    Andrew testified that, in 2010, he lived in Schaumburg, Thanam lived at the property, and Nickolas lived in Wisconsin. In early April 2013, Thanam was admitted to the behavioral unit at St. Alexius Hospital in Hoffman Estates and "diagnosed with dementia and paranoid [*sic*], various other things." She was hospitalized for "about a week or so." To Andrew's knowledge, Nickolas never visited Thanam at the hospital. After Thanam's release, Andrew spent "every other night" with her at the property. In May 2013, Andrew was appointed Thanam's guardian. Upon examining Thanam's financial records, Andrew learned that Thanam had lost over $100,000 in a financial scam.

¶ 19    Andrew testified that, in August 2013, he found Thanam lying on the living room floor and took her to the hospital. She was hospitalized for a couple of days and then was transferred to a rehabilitation facility. To Andrew's knowledge, Nickolas never visited her in the hospital or during rehabilitation. After Thanam returned home, Andrew continued to visit her every other day.

Nickolas was not there on a regular basis but would occasionally "bring some food over" or "take [Thanam] to the store."

¶ 20   Andrew testified that, on October 16, 2013, Thanam called Andrew and told him that she had been bitten by one of her dogs. Andrew left work and took her to the emergency room. Nickolas objected to Andrew's testimony based on relevancy. The trial court overruled the objection and explained:

> "Let me please read to you page two of the lease agreement that the [c]ourt just admitted into evidence. Tenant shall provide a [*sic*] healthcare assistance, end-of-life care assistance and any other assistance deemed necessary by the landlord in lieu of cash rent. That is the relevance."

¶ 21   Andrew identified plaintiffs' exhibit No. 3 as "text logs" from his phone. According to Andrew, the document set forth text messages exchanged between him and Nickolas on the evening of October 16, 2013, while Andrew was at the hospital with Thanam. When plaintiffs' counsel asked to admit the exhibit, the following transpired:

> "MR. NICKOLAS JANOVSKI: I object. There's no evidence that came off a text or anything, phone numbers, dates. It's just a transcript with time stamps on it.
>
> MR. CAMPION [(PLAINTIFFS' COUNSEL)]: He testified it was October 16, 2013. It's a record of what he had on his phone and this is the record of what was said, the dates and the times.
>
> MR. NICKOLAS JANOVSKI: He should be able to pull it off his phone.
>
> THE WITNESS [(ANDREW)]: I can pull them off my phone right now. I'd be more than happy to."

Thereafter, Andrew accessed the relevant text messages on his cell phone. The court noted that it "was shown the phone and the text messages" and that "[t]hey match[ed] letter for letter." The court overruled Nickolas's objection and admitted plaintiffs' exhibit No. 3. In the text exchange, after Andrew asked Nickolas if he wanted to talk to Thanam, Nickolas responded, "Good luck!!!! Go boss around someone else!!! I am done!! NO MORE!!!!!!!!" Later in the exchange, Andrew asked again if Nickolas wanted to talk to Thanam, and Nickolas replied: "She left me her nasty message. I have had enuff of her bullying me two. U two r peas in a pod. I am done!!!!!!!!" Nickolas also wrote: "Good luck taking care of her! I am done!"

¶ 22    Andrew testified that he brought Thanam home on the evening of October 16, 2013, and took the dog who bit her to animal control. Andrew continued to visit Thanam every other day, spending every other night with her. Andrew testified that he had no knowledge of Nickolas visiting Thanam after the dog-bite incident until early 2014, when Nickolas lost his home to foreclosure and moved in with Thanam. Andrew continued his visits, but they were not as frequent because Nickolas was now taking care of her.

¶ 23    Andrew testified that Thanam died on December 24, 2014, at which point he became the successor beneficiary of Land Trust 3503. When Andrew received copies of the trust documents, the lease agreement was not included with them. Andrew told Nickolas he could stay at the property "until he got back on his feet, that the deal was he would take care of the property and pay [Andrew] one-half of the real estate taxes." At that time, Nickolas did not mention the lease agreement. Andrew told Nickolas that he would help him buy a farm property, and, in 2016, he lent Nickolas $150,000 to purchase an 8-acre property on "Green Street," which had a house and two barns (the farm property). Within a year, the house on the farm property burned down; Nickolas had never moved in. He continued to live at the property.

¶ 24 Andrew testified that he contacted Nickolas by e-mail and text message in late December 2021 or early January 2022 and told him that, if he wanted to continue living at the property, he had to "pay the full real estate tax, pay the insurance on the property and take care of the property." Nickolas did not respond, nor did he ever advise Andrew about the lease agreement. In the summer of 2022, Nickolas sent Andrew a $4,000 check to cover one-half of the real estate taxes. In November 2022, Nickolas "provided several post-dated checks that made up the balance of the real estate taxes and insurance on the property."

¶ 25 Nickolas objected to Andrew's testimony on the basis that Nickolas had asked for financial records in discovery but Andrew did not provide them. Plaintiffs' counsel responded, "[I]f we don't have the records of the payment, *** it doesn't mean my client can't testify they were made." The trial court agreed, noting that the canceled checks would have been returned to Nickolas, not Andrew.

¶ 26 Andrew testified that, in April 2022, the Village of Spring Grove (the Village) filed a lawsuit against plaintiffs and Nickolas. Andrew identified a "Petition for an Order of Repair or Demolition," which the Village filed on April 18, 2022, against plaintiffs and Nickolas, seeking an order requiring them to repair or demolish the property. The petition was admitted into evidence, along with numerous photographs depicting the property's condition.

¶ 27 Andrew testified that, at the end of 2022, he sent Nickolas a message that he would be evicted if he did not do certain things. Nickolas did not respond. In January 2023, Andrew filed suit against Nickolas in McHenry County case No. 23-EV-11 (the eviction case), seeking possession of the property. Andrew first became aware of the lease agreement when Nickolas produced it during the eviction case. Andrew testified that Land Trust 3503 did not sign the lease agreement.

¶ 28　At the close of Andrew's direct testimony, plaintiffs' counsel moved to admit plaintiffs' exhibit No. 3, the text message transcript. Nickolas stated: "You did that one already." The trial court stated: "Well, we argued over whether he could testify about it. I don't know that he moved to admit it. Do you have any objection to admitting it?" Nickolas replied, "No. I saw it."

¶ 29　During cross-examination, Nickolas asked Andrew whether Nickolas had a mortgage with Andrew for the farm property. Andrew replied yes and that Nickolas still owed money on it. After further questioning on the mortgage, plaintiffs' counsel objected that the inquiry was not relevant because plaintiffs were not seeking any recovery related to the farm property. In response, Nickolas argued that the issue was whether the payments Andrew testified Nickolas made in connection with the property were, in fact, related to the farm property. The court allowed Nickolas to continue the inquiry. Andrew testified that the payments were not for the farm property; rather, Nickolas made the payments only in 2022, and the payments equaled the amount Andrew requested to pay the real estate taxes and insurance on the property.

¶ 30　Nickolas also questioned Andrew about a November 9, 2023, e-mail from Andrew to Nickolas. In the e-mail, Andrew stated:

"Under the terms of your alleged 'lease' agreement:

'Tenant's duties shall include taking Landlord to appointments, grocery shopping, laundry[,] and any other duties deemed necessary by the Landlord. ***.' "

Andrew then provided dates for when he wanted Nickolas to pick him up and take him to various appointments.

¶ 31　Nicolas asked Andrew whether this e-mail was an attempt to "enforce" or "invoke" the lease agreement. Andrew denied that he sent the e-mail because he thought the lease agreement was valid and enforceable. Rather, he sent it because "[he] was annoyed with [Nickolas] and said

if [Nickolas] want[ed] to pretend that this [was] a valid lease, then [he should] honor the terms of the lease." Andrew acknowledged that Nickolas did not personally reply to the e-mail; rather, Nickolas contacted Andrew's attorney and told him to "tell [his] client not to contact [Nickolas]." The November 9, 2023, e-mail was admitted into evidence without objection.

¶ 32 Called by plaintiffs, Nickolas testified that Thanam prepared the lease agreement. Nickolas testified concerning the foreclosure proceedings against his Wisconsin property and his subsequent appeal (the appellate court decision was admitted into evidence). Nickolas ultimately lost his property in the foreclosure proceeding (during which he filed for four bankruptcies). Plaintiffs' counsel questioned Nickolas about his understanding of various provisions in the lease agreement. Counsel also questioned Nickolas about various ordinance violation charges brought by the Village in relation to the property.

¶ 33 After plaintiffs rested, Nickolas testified to the following relevant facts. He did not join Andrew in seeking guardianship of Thanam, because he thought that it would be a guardianship over only her finances. According to Nickolas, Thanam had become involved with a Nigerian scam, and Nickolas "pushed Andrew into doing [the guardianship] because it seemed like the easiest way to get control of the situation." Nickolas stated that "the deal was [that Nickolas] was going to provide [Thanam] medical care and support." Nickolas did not understand at the time that the guardianship encompassed medical as well as financial issues.

¶ 34 Nickolas described Andrew's testimony regarding Thanam's medical care as "theatrical at best." Nickolas testified to the care he provided Thanam in 2012, 2013, and 2014, such as giving Thanam weekly sponge baths, taking her shopping, helping her on the toilet, cleaning her, and phoning doctors periodically. He testified that bathing Thanam was "psychologically and emotionally scarring." He said that "[it was] draining on [him] doing this day after day after day"

and that "when she went to the hospital to check in or something for a week or two or three, ***
[he] didn't run down there because that was [his] break." Nickolas claimed that Andrew saw
Thanam only once during the last year of her life.

¶ 35    Nickolas testified that he never agreed to pay half the property taxes for the property. He
claimed that the payments he made to Andrew were related to the farm property. When the trial
court inquired whether Nickolas "brought *** proof of payments with [him]" so that the court
could determine how they were allocated, Nickolas responded, "No, *** All the payments I made
are for my mortgage." Nickolas did not perform the services that Andrew's November 9, 2023, e-
mail requested under the lease agreement, because, at that time, Andrew "was already suing to
terminate the lease."

¶ 36    Following Nickolas's testimony, plaintiffs' counsel asked to admit the "land trust
documents" into evidence as plaintiffs' group exhibit No. 12. Nickolas objected that "[i]t should
have been part of discovery." The trial court asked if Nickolas had requested a copy of the Land
Trust 3503 agreement in discovery. Nickolas responded, "I believe I asked for all relevant
documents." After reviewing each of Nickolas's discovery requests, the court determined that
Nickolas made no request for the Land Trust 3503 agreement; Nickolas conceded this. The court
found that, based on Nickolas's admissions in his answer to the complaint, Land Trust 3503 was
the relevant trust agreement and thus was admissible.

¶ 37    The matter proceeded to closing arguments. During his argument, Nickolas revisited the
question, raised during Andrew's testimony, of whether the lease agreement was valid without the
Land Trust 3503's signature. Nickolas suggested that, "[i]f contracts and lawsuits *** cannot be
entered into without the trustee agreeing to participate, *** it calls into question whether or not
this case [was] correctly filed" by Andrew and Land Trust 3503. When the trial court noted that

Land Trust 3503 was named as a plaintiff and that plaintiffs' counsel was named as the attorney of record, Nickolas inquired as to whether there was "any documentation" that Land Trust 3503 "agreed to that." The court replied:

> "[W]e have a complaint with their name on it and [counsel's] appearance as their attorney of record. That, sir, is, by the way, all this [c]ourt ever sees until total conclusion of litigation to determine whether or not an attorney represents, because [counsel] has ethical obligations for his licensing and he has filed an [a]ppearance and he has filed a complaint and that's how we know."

¶ 38                      D. Trial Court's Ruling

¶ 39    Following arguments, the trial court ruled as follows. The court first noted that it found Andrew's testimony to be "largely credible" and Nickolas's testimony to be "less than credible." The court next resolved the issue of whether Land Trust 3503 was required to sign the lease, noting that the trust agreement contained language that expressly permitted the beneficiary to enter into a lease for the property. Thus, the court found that the relevant question was whether the lease was substantively valid.

¶ 40    After reviewing the testimony and exhibits, the trial court concluded that the lease agreement was invalid because it was unconscionable and lacked consideration. In support, the court relied on *Dohrmann v. Swaney*, 2014 IL App (1st) 131524. In that case, George J. Dohrmann III (Dohrmann) and Virginia H. Rogers (Rogers) were neighbors. *Id.* ¶ 3. Rogers and Dohrmann entered into an agreement by which "Rogers agreed to transfer, upon her death, to Dohrmann over $5.5 million in assets in exchange for Dohrmann adding Rogers as an additional middle name to his two sons' names." *Id.* ¶ 31. "According to the plain language of the contract, the addition of 'Rogers' to the boys' names was of value to *** Rogers because it would help the Rogers name

to continue after *** Rogers' death." *Id.* The court held that the consideration for the contract was "so grossly inadequate so as to shock the conscience." *Id.* ¶ 33. Specifically, Dohrmann's promise to add Rogers as an additional name for his two sons was illusory because, among other reasons, "enforcing that obligation [was] a legal impossibility," given that the boys, as minors, were not parties to the agreement and could legally remove Rogers from their names at any time. *Id.* ¶ 34.

¶ 41 The trial court found that here, as in *Dohrmann*, the terms of the lease were so unconscionable as to be tantamount to fraud. The court stated that Thanam was getting "[n]othing" from the lease. The court elaborated:

"This is actually a residential lease agreement that has zero consideration flowing from the tenant to the landlord. The point of a contract is that both parties are to receive consideration. So what that means is that in a typical lease agreement the landlord receives money, tenant gets to stay there. And if the landlord doesn't receive money, then the tenant doesn't get to stay there.

But that's not what we have here. Even if I call the services money, we have the landlord receiving services and the evidence is very clear she did not receive them; but even if she had or even if she hadn't, it matters not. There is no obligation under the expressed terms of this lease agreement for Nickolas *** to do a single thing and he still gets to live there for 20 years and that is because it expressly provides that, on page one, this lease may not be terminated, cancelled, altered or otherwise changed by the landlord under any other circumstance. So in other words, it says you have to pay rent or perform these services; but if you don't, so what, you still get it anyway. *** That means a consideration flowing to the landlord is elusory [*sic*] as it has, in fact, proven to be in this case. Court finds it unconscionable.

Alternatively, the [c]ourt finds that it lacks consideration in favor of the landlord for the reasons set forth on the record. ***."

¶ 42    On May 17, 2024, Nickolas filed a timely notice of appeal.

¶ 43    On July 26, 2024, the trial court entered an order striking Nickolas's motion to stay enforcement of the trial court's order.[1] The court found that it lacked jurisdiction to consider the motion because of the pending appeal. On July 30, 2024, Nickolas filed a motion in this court, asking us to stay enforcement of the trial court's order. We denied Nickolas's motion without prejudice. We noted that, contrary to the trial court's ruling, it did have jurisdiction to rule on the motion despite the notice of appeal. We directed the trial court to rule on the motion and held that, if the court denied the motion, Nickolas could renew his motion in this court. On August 20, 2024, the trial court denied Nickolas's motion for a stay pending appeal. On September 11, 2024, we denied Nickolas's renewed motion for a stay pending appeal.

¶ 44                                    II. ANALYSIS

¶ 45    Nickolas raises the following five arguments on appeal: (1) the trial court erred in denying his objection to plaintiffs' "introduction of evidence of standing at trial without prior disclosure," (2) the court erred in denying his objection to plaintiffs' "introduction of text message evidence" and in "fail[ing] to allow [Nickolas] to examine the evidence," (3) the court erred in overruling Nickolas's objection to Andrew's "testimony regarding rents [Andrew] claimed were paid" where Nickolas requested this information in discovery and Andrew "refused to answer," (4) the court

---

[1]Neither the order nor the underlying motion is contained in the record on appeal. The order is attached as an exhibit to a motion filed in this court asking us to stay enforcement of the trial court's order.

was biased against Nickolas because he appeared *pro se*, and (5) the court "incorrectly applied precedent" in determining that the lease should be rescinded.

¶ 46     In response, plaintiffs initially note that Nickolas's brief violates various requirements of Illinois Supreme Court Rules 341(h)(6) and (h)(7) (eff. Oct. 1, 2020), which govern appellate briefing. Plaintiffs alternatively contend that Nickolas's claims lack merit. We agree that Nickolas's brief violates the supreme court's briefing rules in various respects. We address these violations below to the extent that they impact our consideration of Nickolas's arguments.

¶ 47                    A. Challenge to the Trial Court's Evidentiary Rulings

¶ 48     "The determination of whether evidence is admissible is within the sound discretion of the trial court, and we will not reverse that determination unless the court has abused that discretion." *Murphy v. Kinnally Flaherty Krentz Loran Hodge & Masur, P.C.*, 2023 IL App (2d) 230019, ¶ 40. "A trial court abuses its discretion when its ruling is arbitrary, fanciful, or unreasonable, or no reasonable person would take the view adopted by the trial court, or when its ruling rests on an error of law." *Id.*

¶ 49                    1. Admission of Evidence of "Standing"

¶ 50     Nickolas first contends that the trial court erred in denying his objection to plaintiffs' "introduction of evidence of standing at trial without prior disclosure." More specifically, Nickolas challenges the trial court's admission of Land Trust 3503 documents into evidence. According to Nickolas, plaintiffs were required to provide proof of standing and disclose Land Trust 3503 in discovery prior to trial.

¶ 51     First, we note that, in violation of Rules 341(h)(6) and (h)(7), Nickolas has failed to cite the record to support this claim, either in his statement of facts or his argument. See Ill. S. Ct. R. 341(h)(6), (h)(7) (eff. Oct. 1, 2020) (statement of facts and argument must include citations to the

pages of the record relied on). More critically, however, Nickolas has also failed to properly present his argument. Rule 341(h)(7) provides that an appellant's argument "shall contain the contentions of the appellant and the reasons therefor, with citation of the authorities *** relied on." Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020).

¶ 52 Here, Nickolas cites Illinois rules on hearsay exceptions, Illinois rules on discovery in criminal proceedings, federal civil procedure rules, and federal case law on discovery in criminal proceedings (see, *e.g.*, *Brady v. Maryland*, 373 U.S. 83 (1963)). He offers no argument on the (doubtful) applicability of these authorities. In addition, although Nickolas claims that plaintiffs have failed to establish standing, he presents no supporting legal authority on standing. Given these deficiencies, we find that Nickolas has forfeited his argument. See *Trilisky v. City of Chicago*, 2019 IL App (1st) 182189, ¶ 54 ("The failure to elaborate on an argument, cite persuasive authority, or present a well-reasoned theory violates Rule 341(h)(7) and results in forfeiture of the argument."); *Gakuba v. Kurtz*, 2015 IL App (2d) 140252, ¶ 19 (the failure to cite relevant authority results in forfeiture of the argument); *Lewis v. Heartland Food Corp.*, 2014 IL App (1st) 123303, ¶¶ 5-6 (arguments that fail to comply with Rule 341(h)(7) are forfeited).

¶ 53 Forfeiture aside, Nickolas's argument that the trial court should not have allowed Land Trust 3503 documents into evidence because plaintiffs failed to disclose them during discovery is meritless. Except as otherwise provided by law, "[a]ll relevant evidence is admissible." Ill. R. Evid. 402 (eff. Jan. 1, 2011). It is within the trial court's discretion "to decide whether evidence is relevant and admissible, and a reviewing court will not disturb the *** court's decision absent a clear abuse of that discretion." *Peach v. McGovern*, 2019 IL 123156, ¶ 25. During the trial, Andrew testified regarding Land Trust 3503. At the close of the evidence, plaintiffs' counsel asked to admit the land trust documents. The trial court rejected Nickolas's argument that the documents

should not be admitted based on plaintiffs' failure to disclose them, noting that Nickolas never requested the documents during discovery. The court further found that, based on Nickolas's admissions in his answer to the complaint, Land Trust 3503 was the relevant trust agreement. We find no abuse of discretion.

¶ 54    Nickolas's standing argument is also meritless. The doctrine of standing " 'is designed to preclude persons who have no interest in a controversy from bringing suit,' and 'assures that issues are raised only by those parties with a real interest in the outcome of the controversy.' " *Nationwide Advantage Mortgage Co. v. Ortiz*, 2012 IL App (1st) 112755, ¶ 24 (quoting *Glisson v. City of Marion*, 188 Ill. 2d 211, 221 (1999)). Nickolas argues that Andrew "is not the individual who enacted the *** lease agreement with [Nickolas] but claims to be the beneficiary of *** Land [T]rust 3503." According to Nickolas, Andrew "[was] required to provide proof of his standing to bring the action and [was] required to disclose these documents to *** [Nickolas] prior to trail [*sic*]."

¶ 55    Contrary to Nickolas's argument, "lack of standing is an affirmative defense that must be pleaded and proven *by the defendant*, rather than the plaintiff." (Emphasis added.) *Amos Financial, LLC v. Szydlowski*, 2022 IL App (1st) 210046, ¶ 44. Here, Nickolas failed to plead lack of standing as an affirmative defense. Thus, Nickolas has forfeited any claim that plaintiffs do not have standing. See *Ortiz*, 2012 IL App (1st) 112755, ¶ 24 (a defendant forfeits the issue of standing if he fails to timely raise it before the trial court).

¶ 56            2. Admission of Text Messages Between Nickolas and Andrew

¶ 57    Nickolas next contends that "the trial court erred in denying [Nickolas's] objection to [plaintiffs'] introduction of text message evidence and *** [in] fail[ing] to allow [Nickolas] to examine the evidence." He does not contend that the evidence was irrelevant; he argues only that

the court erred in admitting the evidence without first allowing him to examine Andrew's cell phone.

¶ 58     First, we note that Nickolas has forfeited this argument for failing to comply with Rules 341(h)(6) and (h)(7). See *Trilisky*, 2019 IL App (1st) 182189, ¶ 54 ("The failure to elaborate on an argument, cite persuasive authority, or present a well-reasoned theory violates Rule 341(h)(7) and results in forfeiture of the argument.") Briefing deficiencies aside, Nickolas's argument nevertheless fails.

¶ 59     During the trial, the court overruled Nickolas's relevancy objection to Andrew's testimony that he went to the emergency room with Thanam on the evening of October 16, 2013. The court reasoned that the terms of the lease agreement provided that Nickolas shall provide healthcare assistance. Nickolas again objected when plaintiffs' counsel sought to admit a transcript of text messages Nickolas exchanged with Andrew while he was in the hospital with Thanam. Nickolas protested that "[Andrew] should be able to pull it off his phone," which Andrew then did. The court viewed the cell phone and confirmed that the text messages on the cell phone matched the transcript. Later, when plaintiffs' counsel moved to admit the text message transcript, the court asked Nickolas if he "ha[d] any objection to admitting it[.]" Nickolas replied, "No. I saw it."

¶ 60     Given the above, Nickolas cannot now claim error in the way the trial court proceeded. Under " 'the doctrine of invited error,' " a party " 'may not request to proceed in one manner and then later contend on appeal that the course of action was in error.' " *People v. Harvey*, 211 Ill.2d 368, 385 (2004) (quoting *People v. Carter*, 208 Ill. 2d 309, 319 (2003)). To permit a party to use, as a vehicle for reversal, the exact action that it procured in the trial court " 'would offend all notions of fair play' " and encourage duplicity by litigants. *Id.* (quoting *People v. Villarreal*, 198 Ill. 2d 209, 227 (2001)).

¶ 61 Here, it was Nickolas who stated that Andrew should be able to retrieve the messages from his cell phone, and when the trial court looked at the phone, Nickolas did not object or request to view the phone. As he invited the way the court proceeded, he cannot now claim it was error. Moreover, Nickolas later expressly stated that he had no objection to the admission of the text message transcript, because "[he] saw it." Thus, any objection has been forfeited. See *Babikian v. Mruz*, 2011 IL App (1st) 102579, ¶ 13 (failure to object to the admission of evidence at trial results in forfeiture of the issue on appeal). Accordingly, we find no error.

¶ 62                    3. Testimony Regarding Payments Received by Andrew

¶ 63 Nickolas's third evidentiary challenge concerns Andrew's testimony that he contacted Nickolas in late December 2021 or early January 2022 and told him that, if he wanted to continue living at the property, he had to "pay the full real estate tax, pay the insurance on the property and take care of the property." According to Andrew, in the summer of 2022, Nickolas sent Andrew a $4,000 check to cover one-half of the real estate taxes and, in November 2022, Nickolas sent several post-dated checks to make up the balance due on the real estate taxes and property insurance.

¶ 64 Nickolas objected to Andrew's testimony on the basis that he had asked for financial records in discovery and Andrew did not provide them. Plaintiffs' counsel responded, "[I]f we don't have the records of the payment, *** it doesn't mean my client can't testify they were made." The trial court agreed, noting that the canceled checks would have been returned to Nickolas, not Andrew.

¶ 65 Nickolas now claims that the trial court erred. However, he again cites inapplicable authority, such as federal discovery rules and federal case law addressing *Brady* violations. He also cites section 8-401 of the Illinois Code of Civil Procedure (735 ILCS 5/8-401 (West 2022)),

which governs the admissibility of "account books" that are made in the regular course of business, but he does not explain its applicability. Accordingly, Nickolas has forfeited his challenge to the admissibility of Andrew's testimony. See *Trilisky*, 2019 IL App (1st) 182189, ¶ 54 ("The failure to elaborate on an argument, cite persuasive authority, or present a well-reasoned theory violates Rule 341(h)(7) and results in forfeiture of the argument.").

¶ 66    Forfeiture aside, we find no error. Nickolas did not dispute that he made payments to Andrew, but he claimed that the payments were for the "mortgage" (presumably on the farm property), not the lease. However, when the trial court inquired if he had proof to establish that fact, Nickolas replied no. The court was entitled to hear the testimony and make a credibility determination as to the purpose of those payments, as it was relevant to the parties' understanding of the lease.

¶ 67                          B. Judicial Bias Against Nickolas

¶ 68    Nickolas's fourth contention is that the trial court exhibited bias toward Nickolas because he was a *pro se* litigant. As evidence of bias, Nickolas points to (1) the court's comments that plaintiffs' counsel was not obligated to prove that Land Trust 3503 had retained him as counsel; (2) the court's evidentiary rulings in favor of plaintiffs despite their "fail[ure] to comply with both State and federal rules of discovery"; (3) the court's admission of the text message transcript into evidence without first allowing Nickolas to view Andrew's phone; (4) the court's denial of Nickolas's motion for summary judgment, where the court "did not read the motion ahead of the hearing and took less than 2 minutes to read it before dismissing it"; and (5) the court's "refus[al] to hear" Nickolas's motion to stay the judgment pending appeal.

¶ 69    In *Eychaner v. Gross*, 202 Ill. 2d 228, 280 (2002), our supreme court addressed the concept of judicial bias. A trial judge is presumed to be impartial, and the party alleging prejudice bears

the burden to overcome the presumption. *Id.* "[T]he party making the charge of prejudice must present evidence of prejudicial trial conduct and evidence of the judge's personal bias." *Id.* "A judge's rulings alone almost never constitute a valid basis for a claim of judicial bias or partiality." *Id.* "Allegedly erroneous findings and rulings by the trial court are insufficient reasons to believe that the court has a personal bias for or against a litigant." *Id.* "Rather, the party making the charge of prejudice must present evidence of prejudicial trial conduct and evidence of the judge's personal bias." *Id.* Personal bias can stem from an "extrajudicial source" or "from the facts adduced or the events occurring at trial." *Id.* Our supreme court adopted the following statement from the United States Supreme Court:

> " '[O]pinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings, or of prior proceedings, do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible. Thus, judicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge. They *may* do so if they reveal an opinion that derives from an extrajudicial source; and they *will* do so if they reveal such a high degree of favoritism or antagonism as to make fair judgment impossible.' " (Emphasis in original.) *Id.* at 281 (quoting *Liteky v. United States*, 510 U.S. 540, 555 (1994)).

¶ 70 Nickolas's claims of judicial bias are meritless. First, his claim regarding the trial court's handling of his summary judgment motion is not supported by the record. The court's written order states that the matter was before the court "for hearing" on the motion and that the court denied the motion "having considered the pleadings and hearing arguments of [d]efendant and counsel for [p]laintiff[s]." Second, although the court initially struck Nickolas's motion for a stay pending

appeal on its erroneous belief that it lacked the jurisdiction to do so, "[a]llegedly erroneous findings and rulings by the trial court are insufficient reasons to believe that the court has a personal bias for or against a litigant." *Id.* at 280. Third, Nickolas's complaints about the court's other evidentiary rulings, even if they were erroneous, are also insufficient to establish bias. In any event, none of the complained-of comments or actions "reveal such a high degree of favoritism or antagonism as to make fair judgment impossible." (Internal quotation marks omitted.) *Id.* at 281. To the contrary, the record reflects that the court at all times ensured that Nickolas's arguments were heard.

¶ 71                    C. Incorrect Application of Precedent

¶ 72    Finally, Nickolas contends that the trial court erred in finding in favor of plaintiffs and rescinding the lease.

¶ 73    We reverse a judgment after a bench trial only if it is against the manifest weight of the evidence. *Gambino v. Boulevard Mortgage Corp.*, 398 Ill. App. 3d 21, 51 (2009). " 'A decision is against the manifest weight of the evidence only when an opposite conclusion is apparent or when the findings appear to be unreasonable, arbitrary, or not based on the evidence.' " *Wade v. Stewart Title Guaranty Co.*, 2017 IL App (1st) 161765, ¶ 59 (quoting *Eychaner*, 202 Ill. 2d at 252). "The manifest weight of the evidence standard affords great deference to the trial court because the trial court is in a superior position to determine and weigh the credibility of the witnesses, observe witnesses' demeanor, and resolve conflicts in their testimony." *Id.* This case also involves the interpretation of a lease, which presents an issue of law that we review *de novo*. *Philadelphia Indemnity Insurance Co. v. Gonzalez*, 2024 IL App (1st) 230833, ¶ 23.

¶ 74    Nickolas argues that the trial court "incorrectly applied precedent" when it found in favor of plaintiffs and rescinded the lease. Relying on *Dohrmann*, the court concluded that the lease was

invalid because it was unconscionable and lacked consideration. According to Nickolas, *Dohrmann* does not apply because here, unlike in *Dohrmann*, Andrew "accepted and invoked [the] clauses of the *** lease agreement, so he can no longer claim [the] relief he sought." In support, Nickolas points to Andrew's November 9, 2023, e-mail. Nickolas's argument is meritless.

¶ 75    We note that Nickolas has cited no authority for the proposition that a party who "accept[s] and invoke[s]" a lease provision (or any contract provision, for that matter) cannot thereafter challenge the validity of the provision. Accordingly, Nickolas has forfeited this argument. See *Gakuba*, 2015 IL App (2d) 140252, ¶ 19 (the failure to cite relevant authority results in forfeiture of the argument). Forfeiture aside, even if the proposition were true, we would not conclude that Andrew "accepted and invoked" the lease agreement. Andrew testified that he sent the e-mail not because he believed that the lease agreement was valid and enforceable, but because "[he] was annoyed with [Nickolas] and said if [Nickolas] want[ed] to pretend that this [was] a valid lease, then [he should] honor the terms of the lease." The trial court heard Andrew's testimony, made a credibility determination, and accepted this testimony as truthful. We cannot say that this conclusion was against the manifest weight of the evidence. Thus, Nickolas's argument that *Dohrmann* is distinguishable on this basis (and was improperly relied on by the court) necessarily fails because the trial court properly rejected the suggestion that Andrew "accepted and invoked" the lease agreement.

¶ 76    Nickolas does not argue that the trial court otherwise erred in finding that the lease was invalid, *i.e.*, he does not argue that the court erred in concluding that the lease was unconscionable and lacked consideration. We do not consider the propriety of the court's ruling on any basis other than what Nickolas presents. See *People v. Hampton*, 165 Ill. 2d 472, 478 (1995); Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020) ("Points not argued [in an appellant's brief] are forfeited and shall not

be raised in the reply brief, in oral argument, or on petition for rehearing."). Forfeiture aside, we find no basis to disturb the court's ruling. We agree with the court's application of *Dohrmann* and its conclusion that the lease was unconscionable and lacked consideration.

¶ 77                                    III. CONCLUSION

¶ 78     For the reasons stated, we affirm the judgment of the circuit court of McHenry County.

¶ 79     Affirmed.